Filed 6/22/21  In re Hailey E. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re HAILEY E. et al., Persons Coming Under the Juvenile Court Law. | B306896 (Los Angeles County Super. Ct. No. 18CCJP04864C-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CRYSTAL M. et al.,<br><br>Defendants and Appellants. | |

APPEAL from findings and orders of the Superior Court of Los Angeles County, Sabina A. Helton, Judge.  Affirmed in part and reversed in part.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant Crystal M.

Deborah Dentler, under appointment by the Court of Appeal, for Defendant and Appellant Joshua M.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellants Crystal M. (mother) and Joshua M. (father) are the parents of Kyle M. (Kyle, born 2014). Mother and Jeremy E. (Jeremy)[1] are the parents of Hailey E. (Hailey, born 2009).[2]

The juvenile court adjudicated minors dependents of the court under Welfare and Institutions Code section 300, subdivision (b)(1).[3] Kyle was removed from parental custody, while Hailey was released to mother under the supervision of the Los Angeles County Department of Children and Family Services (DCFS).

On appeal, mother argues that insufficient evidence supports (1) the jurisdictional finding as to Kyle based on

---

[1]    Jeremy did not appear below and is not a party to this appeal.

[2]    We refer to Kyle and Hailey, collectively, as minors.

[3]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

mother's inability to care for Kyle's life-threatening medical condition; (2) the jurisdictional finding as to Hailey based on Jeremy's substance abuse; and (3) the dispositional order removing Kyle. Father argues that insufficient evidence supports the jurisdictional finding as to Kyle based on father's substance abuse and mother's failure to protect Kyle from it. Father also challenges the dispositional orders to the extent that they affect him.

We affirm the jurisdictional findings and dispositional orders as to Kyle. However, we agree with mother that substantial evidence does not support the exercise of jurisdiction over Hailey. Accordingly, we reverse the jurisdictional finding and corresponding dispositional orders as to Hailey only.

## BACKGROUND

### I. *Prior Juvenile Dependency Case*

In September 2018, the juvenile court sustained a section 300 dependency petition on behalf of minors. As sustained, the petition alleged that father was a current abuser of amphetamines and methamphetamines and had a history of driving under the influence of alcohol and drugs. The petition also alleged that Jeremy, Hailey's father, had a history of abusing amphetamines and methamphetamines, as well as a drug-related criminal history.

In March 2019, the juvenile court awarded mother sole physical and legal custody of minors, granted father and Jeremy monitored visitation with their respective children, and terminated jurisdiction.

### II. *Referral*

On September 28, 2019, DCFS received a referral alleging severe neglect of Kyle, with Hailey also at risk. Mother had

3

brought Kyle, who was autistic, to the hospital due to nausea, diarrhea, and vomiting. He looked emaciated, and a doctor was concerned about neglect. Kyle was determined to have type 1 diabetes and sepsis.

III. *DCFS's Initial Investigation*

In response to the referral, a DCFS social worker conducted interviews with the reporting party, a hospital social worker, family members, mother's roommate, and Kyle's teacher.

A. Reporting party

The reporting party told the DCFS social worker that Kyle had been so emaciated when he arrived at the hospital that staff had wanted to call the police. Mother had appeared to be more concerned about her boyfriend than Kyle. Mother was unable to provide a timeframe of when Kyle's health began to decline. Kyle weighed only 27 pounds; a child his age should weigh at least 40 pounds. Kyle appeared to be nonverbal.

B. Hospital social worker

According to a hospital social worker, a doctor reported that Kyle's severe weight loss was not solely attributable to diabetes and that there appeared to be some neglect and malnutrition. The hospital social worker expressed concerns about mother not being present at Kyle's bedside and that mother's understanding of his condition was lacking.

C. Mother

According to mother, Kyle's health issues related to his ears and throat. She had noticed three weeks earlier that he was losing weight. Two days earlier, she had taken him to a medical clinic to have his eyes and ears examined by Dr. Dominguez, who did not find any abnormalities. Although Dr. Dominguez instructed mother to take Kyle to have blood work done, she did

4

not do so.  Instead, mother took Hailey to have her eyes examined.  Mother wanted Kyle to have a CT scan because she did not believe his symptoms were solely caused by diabetes.

Mother reported that Kyle's diet consisted of carbohydrates, which caused him to become constipated.  When asked if she had attempted to give Kyle any nutritional supplements, mother responded that she had purchased PediaSure for him a month earlier.  Mother attributed Kyle's weight loss to a growth spurt.

Mother admitted that she allowed father to have an unmonitored visit with Kyle on June 9, 2019.  She could not explain why she violated the court's visitation order.

Mother stated that Kyle had been diagnosed with autism at age three.  He was receiving regional center services and attended school.  Hailey was in the fifth grade and had podiatry issues but was otherwise healthy.

The DCFS social worker observed mother fidgeting throughout the interview, that her eyes were dilated, and that she appeared to have methamphetamine sores on her face.  Mother continuously stated that she had met with a dermatologist regarding her skin condition and was upset that the doctor did not know the cause.

When the DCFS social worker spoke with mother a few days later and informed her that she was scheduled to drug test, mother said that she could not do so because she was at Kyle's bedside and could not leave.  Mother became argumentative and raised her voice.

D.  Father

Father stated that it had been two months since he had seen Kyle.  On June 9, 2019, mother left Kyle, unmonitored, with

father at a park.  At that time, Kyle appeared healthy, with no signs of neglect.  Mother had not allowed father visitation because he was not paying child support.  Father was very concerned about Kyle because he was autistic and nonverbal.

Father reported that mother had a history of using methamphetamines and that she had introduced him to the drug.  During the prior dependency case, mother used methamphetamines but would test when she knew the drug would be out of her system.  Father said he protected mother by not telling DCFS.

Father was homeless and lived in his vehicle and motels.  He denied current drug use or a history of mental illness.

E. Hailey

Hailey was interviewed at the family home.  She attended the fifth grade and liked school.  She had not noticed Kyle's weight loss because she was always playing with her friends.  She denied abuse and appeared clean, well-cared for, and free of marks or bruises.

F. Hailey's paternal grandmother

Hailey's paternal grandmother, who visited Hailey every other weekend, believed that mother had bipolar disorder.  She reported that Hailey's father, Jeremy, lived in Colorado and did not have consistent visitation with Hailey.

G. Mother's roommate

Mother's roommate had known mother for 23 years; mother and minors had resided with him for two years.  He and mother noticed that Kyle appeared to be ill two days before he was hospitalized.  The roommate reported that Kyle only drank milk and did not usually eat solid food, but he would occasionally eat bread or mini corndogs and something off someone else's plate.

Kyle appeared thinner than normal, but the roommate and mother attributed this to him growing.

The roommate denied ever observing mother engage in substance abuse. He thought that minors were safe in mother's care and that she took good care of them.

### H. Kyle's teacher

Kyle's teacher, Ms. B., became concerned about Kyle on September 24, 2019, because he was lethargic and very hungry. He displayed these symptoms for two days. Ms. B. expressed her concerns to Ms. E., the school psychologist. Ms. E. attempted to make telephonic contact with mother several times, but mother did not answer and the voice mailbox was full. Mother contacted the school on September 26, 2019, and reported that Kyle needed blood work and that the results were bad. Ms. B. did not recognize Kyle's weight loss because she was new to the school. However, staff who previously worked with Kyle had noticed it.

## IV. *Orders Removing Minors*

On October 4, 2019, DCFS sought and was granted orders removing Hailey from mother and removing Kyle from mother and father. The next day, the DCFS social worker provided mother and father with the removal orders and then met privately with each.

Mother did not appear to be under the influence; she was alert and easy to engage. The social worker explained that, even though mother's toxicology results had returned negative two days earlier, she was convinced that mother had been under the influence of a controlled substance when they had last met on September 28, 2019. Mother denied any substance use.

Father admitted that he had been arrested on September 22, 2019. He claimed that his friend had left powder cocaine in his vehicle, but he denied his own use.

V. *Dependency Petition*

On October 8, 2019, DCFS filed a dependency petition seeking the juvenile court's exercise of jurisdiction over minors pursuant to section 300, subdivisions (b)(1) (failure to protect) and (j) (abuse of sibling).

For the b-1 and j-1 counts, the petition alleged that Kyle had been diagnosed with "Malnutrition-Chronic Severe and Diabetes Mellitus with Ketoacidosis." For at least three weeks prior to his hospitalization on September 28, 2019, Kyle had been lethargic, emaciated, and had lost a significant amount of weight. Mother had failed to obtain timely medical care for Kyle and follow up with a previous medical recommendation for blood work. Mother's medical neglect of Kyle endangered his physical health and safety and also placed Hailey at risk of serious physical harm.

For the b-2 count, the petition alleged that father had a history of substance abuse, including amphetamine and methamphetamine abuse, which rendered him incapable of providing regular care for Kyle. He also had a history of criminal convictions for driving under the influence of alcohol and drugs. Mother had failed to protect Kyle from father's substance abuse, having allowed father to have unlimited access to Kyle in violation of a court order that father's visits be monitored. Mother and father's conduct endangered Kyle's physical health and safety and placed him at risk of serious physical harm.

VI. *Detention Hearing*

At the detention hearing on October 9, 2019, the juvenile court found that a prima facie showing had been made to detain minors and that there was a substantial risk of detriment to minors absent removal. Mother and father were granted monitored visitation.

VII. *Jurisdiction/Disposition Report*

By mid-October 2019, Hailey had been placed with one of her paternal relatives, and Kyle had been placed with his paternal grandmother.

The DCFS dependency investigator assessed Kyle in the grandmother's home on November 19, 2019. He was playful and making efforts to communicate. He appeared very comfortable with his paternal grandparents and was cooperative when a glucose check was administered. His grandmother reported that Kyle had gained 10 pounds.

Mother visited minors on Saturdays, and they appeared to be happy to engage with her. Mother appeared overly concerned with attempting to apply ointments to Kyle's skin. She was instructed not to do so because there was no prescription or label for the ointments.

DCFS reported that mother continued to not understand Kyle's need for medical services and referenced a letter dated October 24, 2019, from California Children's Services stating that mother had not responded to their multiple attempts to contact her to ensure that Kyle was eligible for services. Although mother stated that she wanted assistance and education regarding treating type 1 diabetes, she also told the dependency investigator that she was no longer welcome to participate in the education classes at Children's Miller Hospital due to her being

9

disruptive. DCFS had serious concerns about her ability to understand and administer Kyle's complicated medical treatments.

As to father, DCFS reported that, on September 22, 2019, police observed a hypodermic needle and a white crystalline substance resembling methamphetamine when father opened the door of his vehicle. A glass pipe with black and white residue, consistent with drug paraphernalia, was found during a search of the vehicle. Father did not show up for drug tests on October 17, 22, and 29, and November 8, 2019. On November 13, 2019, he tested positive for methamphetamines and marijuana. Mother claimed that father had shown her a photo of how he would cheat a drug test.

VIII. *First Amended Petition*

On December 6, 2019, DCFS filed a first amended petition. The b-1 and j-1 counts were unaltered. The b-2 count was amended to add that father was a current abuser of methamphetamines and had tested positive for methamphetamines and marijuana on November 13, 2019. A b-3 count was added alleging that Hailey's father, Jeremy, had a history of abusing amphetamines and methamphetamines.

IX. *Last Minute Information for the Court (January 13, 2020)*

Mother tested negative for drugs on December 6, 19, and 27, 2019, and January 3, 2020. She also tested negative on January 8, 2020, but the sample was diluted. She missed a test on December 12, 2019.

Kyle's paternal grandmother was no longer willing to monitor mother's visits due to an argument between them. The DCFS social worker planned to continue to coordinate visits between mother and Kyle, but Kyle was unable to travel a long

10

distance due to his medical issues.  Mother and Hailey were visiting on a weekly basis, and there were no concerns.

DCFS conducted a meeting with mother and Kyle's paternal grandmother on January 7, 2020.  The family's goal was identified as reunifying minors with mother.  The family's needs included developing a comprehensive medical plan for Kyle and mother being notified of all of Kyle's medical appointments and being able to attend them with a monitor.

Father missed four drug tests between December 6 and 27, 2019.  Father appeared for a drug test on January 3, 2020, but the facility reported that it was unable to observe his penis while he urinated.  DCFS described this as "an ongoing concern" and referenced mother's earlier report that father was cheating on his drug tests.

X. *Last Minute Information for the Court (May 26, 2020)*

Mother provided DCFS with confirmation that she had completed a 10-week parenting program.  She continued to test negative for drugs and alcohol, but her March 9, 2020, and May 7, 2020, tests were diluted, and she missed a test on April 21, 2020.  Father tested negative for drugs on January 17, 2020, but had missed subsequent tests.

The DCFS dependency investigator spoke with Kyle's endocrinologist, Dr. Hicks, on May 12, 2020.  Dr. Hicks expressed concern about the parents not completing necessary medical training within 10 days of Kyle's hospitalization and that, during his hospitalization, they were not as involved as typical parents and would only show up sporadically.  Kyle's paternal grandmother had taken him to his first visit with the endocrinologist, while the parents did not show up.  The parents attended the second visit.  Dr. Hicks stated that Kyle needed

11

follow-up medical care, and she expressed concern about mother's ability to follow through with Kyle's treatment.

DCFS continued to have concerns about the parents' ability to care for Kyle, who continued to struggle with diabetes complications. Mother had not been an active participant in Kyle's treatment. DCFS was concerned that she was unable or unwilling to utilize available resources to care for him.

XI. *Last Minute Information for the Court (July 20, 2020)*

On July 9, 2020, the dependency investigator contacted Dr. Alvarez, Kyle's initial endocrinologist, who had treated him during his hospitalization. Dr. Alvarez said that there was confusion as to who was the child's primary caregiver and who would be following up with his medical needs. The hospital was unsuccessful in its efforts to contact Dr. Dominguez, Kyle's primary doctor, to obtain his medical history.[4] It was difficult for Dr. Alvarez to say what happened prior to Kyle being seen at the hospital because only certain data could be gathered from the parents. It was possible that Dr. Dominguez did not catch any concerns regarding diabetes.

Mother completed training with respect to diabetes and a continuous glucose monitor device. Kyle's caregivers reported that he was doing well and experiencing more stable sugar levels since a continuous monitoring device was placed on his body. Father was visiting Kyle on a weekly basis, but mother was not visiting.

Hailey was doing well and recently had a birthday party that mother and her father, Jeremy, attended.

---

[4] The dependency investigator was also unsuccessful in her attempts to contact Dr. Dominguez.

DCFS remained concerned about mother's ability to care for Kyle. It took mother six months to complete required medical training. Prior to completing the training, mother had not been an active participant in Kyle's medical care.

Father was not addressing his substance abuse problem, as he was neither testing nor enrolled in services.

XII. *Adjudication Hearing*

The adjudication hearing took place over the course of several days in July 2020.

A. Mother's testimony

Mother testified that, prior to be being diagnosed with diabetes in September 2019, Kyle had been diagnosed with autism, seizures, a yeast infection, impetigo, and eye problems. Mother had taken a year off of work to focus on Kyle's medical condition. Kyle had always struggled with low weight and difficulty eating. Mother had sought medical advice about Kyle's weight and nutrition.

Mother took both Kyle and Hailey to the doctor two days before Kyle's hospitalization in September 2019. Hailey "had something in her eyes[,]" and mother wanted Kyle checked because his yeast infection had returned and he had possible weight loss. Kyle was active at the doctor's office and "didn't seem physically ill" to mother. The doctor gave mother paperwork for blood work, but she did not get the impression that it needed to be done immediately.

The next day, Kyle insisted on staying in mother's roommate's room. Kyle was restless and vomited later that night. Mother asked Kyle if he wanted to go to the doctor and, despite "his lack of communication, Kyle did tell [mother] no, he didn't want to go to the doctor that night[.]"

13

The following morning, on Saturday, September 28, 2019, Kyle woke up and said, "'Mommy, doctor.'" Kyle was taken to the emergency room by ambulance, with mother arriving separately about an hour and a half later, as she had stopped to obtain his medical records. Mother left the hospital at approximately 9:30 p.m. or 10:00 p.m. that night because she and father "were having a sensitive matter" and decided it was best that father have some time with Kyle to bond. Mother informed the hospital staff that father's visits had to be supervised; the staff indicated "they would be okay" with monitoring.

Mother did not return to the hospital until approximately 6:00 p.m. the next day, Sunday. She had tried to locate an available car at a car dealership and had cleaned her home. She stayed at the hospital until 12:00 a.m. or 1:00 a.m. She returned to the hospital on Tuesday afternoon and was also there on Wednesday and Thursday. According to mother, she spent four nights at the hospital with Kyle until she was told that she was not allowed to spend the night. She tried to stay at the hospital during the day for the remainder of Kyle's stay there.

Mother stated that she "immediately jumped on trying to get diabetic training" and that she went to a group diabetic training session at the hospital. She claimed that the DCFS social worker informed the hospital that she was not allowed to receive any training, thus thwarting her from doing so.

Mother said that she contacted the parenting courses on a list DCFS provided to her and that half of them were not in service and the other facilities did not provide free services or have available dates. She completed an online training but was told that it would not be accepted. Mother testified that she had reached out to the DCFS social worker and the hospital

14

numerous times to obtain training. Mother was not able to obtain the training until June 10, 2020.

Mother admitted that she had left Kyle unmonitored with father once. She had been "under the impression that . . . father had completed all the court orders asked of him such as rehab."

B. <u>Dr. Ryan O'Connor's testimony</u>

Mother called Dr. O'Connor, an emergency medical physician, as a witness. The juvenile court qualified him as an expert for the matter. Dr. O'Connor had reviewed Kyle's medical records, as well as the detention and adjudication reports.

Dr. O'Connor opined that it was possible that Kyle could have between sporadically hyper and then lethargic in the week prior to his hospitalization, as "symptoms can be waxing and waning." The onset of type 1 diabetes "can be very subtle in the beginning" and then a child can "have a very sudden rapid deterioration perhaps over approximately a day or two even." Based on the documentation regarding Kyle's September 26, 2019, doctor's visit, Dr. O'Connor found no indication that the doctor "thought that there was anything that would be considered emergent" even though it would be expected to find some abnormalities presented during the physical exam given Kyle's condition when he was taken to the emergency room two days later.

Dr. O'Connor explained that "[f]ailure to thrive is a multifactorial issue" that can be caused by neglecting a child as well as "other issues unrelated to neglect such as metabolic diseases."

C. <u>Jurisdictional findings</u>

After entertaining oral argument, the juvenile court took the matter under submission. On July 28, 2020, the court

sustained counts b-1 (amended to conform to proof),[5] b-2, and b-3. The court struck count j-1.

The juvenile court recounted the events in the days prior to Kyle's hospitalization and did not believe that Kyle's symptoms would have necessarily been a basis for mother to take him to a doctor. The court noted that while it would "have been better" if mother had Kyle's bloodwork taken after it was ordered on September 26, 2019, the court did not "know if it would have made a difference." In reviewing the timeline, the court did not believe that mother's actions could be criticized. "[L]eading up to the time of the hospitalization, mother was on top of medical care for her children."

The juvenile court, however, had "more concerns with mother's conduct after the diagnosis" of type 1 diabetes. The record was undisputed that mother had not completed diabetes training until June 10, 2020, or the continuous glucose monitor device training until July 9, 2020. The court noted mother's "slowness" to follow up regarding training. Regardless of whether DCFS could have followed up more regarding training for mother, mother had not demonstrated that she could "safely care for Kyle and his condition." And, even if mother had completed "appropriate training[,]" she had not yet had an

---

[5]    As amended, the sustained b-1 count states: "On 9/28/2019, the child, Kyle . . . , was medically examined and diagnosed with Malnutrition-Chronic Severe and Diabetes Mellitus with Ketoacidosis. The child suffered from respiratory distress, dehydration, nausea, vomiting and diarrhea, and had lost some weight when he was admitted to the hospital on 9/28/2019. The child's mother, Crystal M[.], lacks the current ability to care for and attend to the child's life threatening health condition."

16

opportunity to implement it because she was still restricted to monitored visits.

### D. Dispositional orders

The juvenile court declared minors dependents of the court. Hailey was released to mother, under DCFS supervision. The court found, by clear and convincing evidence, that there were no reasonable means to protect Kyle's health and safety absent removal from mother and father.

The juvenile court ordered mother and father to participate in services, including CPR training for both parents[6] and a full drug and alcohol program with aftercare for father. The court ordered that mother's and father's visits with Kyle be monitored with DCFS discretion to liberalize.

The juvenile court stated that DCFS was "going to have to work closely with the grandparents and the mother in formulating a transition plan for mother to have her unmonitored visits at some point with Kyle."

## XIII. *Appeal*

Mother and father each filed a timely notice of appeal from the jurisdictional findings and dispositional orders.

## DISCUSSION

### I. *Jurisdictional Findings*

Mother challenges the juvenile court's jurisdictional findings with respect to the b-1 count regarding her inability to care for Kyle's life threatening health condition and the b-3 count regarding Jeremy's substance abuse. Father challenges the

---

[6] The juvenile court reasoned that, "if something really were bad to happen to Kyle," a combination of CPR and insulin might be required.

court's finding with respect to the b-2 count regarding father's substance abuse.

A. Applicable law and standard of review

Under section 300, subdivision (b)(1), the juvenile court has jurisdiction over and may adjudge to be a dependent of the court a "child [who] has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse."

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivision[] at issue here require[s] only a 'substantial risk' that the child will be abused or neglected. The legislatively declared purpose . . . 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm.*' (§ 300.2, italics added.)" (*In re I.J.* (2013) 56 Cal.4th 766, 773; see also *In re K.B.* (2021) 59 Cal.App.5th 593, 603 (*K.B.*) ["The court need not wait for disaster to strike before asserting jurisdiction. [Citation.] This is why the statute uses the word 'risk.'"].)

"The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.) "'[T]he finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of harm[]'" to a child

18

"six years old or younger at the time of the jurisdiction hearing[.]" (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219 (*Christopher R.*).)  For a child "'of such tender years . . . the absence of adequate supervision and care poses an inherent risk to [his or her] physical health and safety.'" (*Id.* at p. 1216.)

Jurisdictional findings must be made by a preponderance of the evidence.  (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.)  We review those findings for substantial evidence—"evidence that is reasonable, credible and of solid value.  [Citations.]  We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence.  Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

B.  <u>Analysis</u>

Substantial evidence supports the juvenile court's jurisdictional findings as to Kyle on counts b-1 and b-2.  The court's jurisdictional finding as to Hailey on count b-3, however, is not supported by substantial evidence.

1.  *Count b-1:  Mother's inability to care for Kyle's medical condition*

Kyle suffers from a chronic, life-threatening medical condition that requires daily, skilled monitoring.  Properly addressing his medical needs is further complicated by his young age and autism, which affects his ability to communicate.  Despite Kyle being diagnosed with type 1 diabetes in September 2019, mother did not successfully complete diabetes training until June 2020 or continuous glucose monitor device training

until July 2020. By the time of the adjudication hearing in August 2020, mother had still not progressed to unmonitored visitation and, thus, had not actually implemented her newly acquired training. Given the potential chasm between training and successful implementation, the juvenile court could reasonably infer that mother was not adequately equipped to care and attend to Kyle's critical medical needs.

This constitutes substantial evidence that mother lacked the ability "to adequately supervise or protect" Kyle, thus placing him at substantial risk of serious physical harm or illness. (§ 300, subd. (b)(1); see also *In re Madison S.* (2017) 15 Cal.App.5th 308, 318 ["Substantial evidence may include inferences, so long as any such inferences are based on logic and reason and rest on the evidence"].) The juvenile court did not need to "wait for disaster to strike before asserting jurisdiction." (*K.B.*, *supra*, 59 Cal.App.5th at p. 603.)

Mother contends that her delay in obtaining the diabetes training is attributable, at least in part, to DCFS's failure to provide assistance. She also argues that her inconsistent visitation and the fact that she never progressed to unmonitored visitation were due to factors beyond her control.

These arguments miss the point. The first clause of section 300, subdivision (b)(1), authorizes dependency jurisdiction based on "the failure or inability" of a parent "to adequately supervise or protect" a child. No finding of "parental fault" is required. (*In re R.T.* (2017) 3 Cal.5th 622, 632.) Having already identified substantial evidence to support the finding that mother lacked the ability to supervise or protect Kyle, it is irrelevant whether mother is "at fault or blameworthy for her . . . inability . . . ." (*Id.* at p. 624; see also *id.* at p. 634.)

20

## 2. *Count b-2: Father's substance abuse*

Father does not challenge the juvenile court's finding that he abused substances. Ample evidence supports this finding, given that police observed drug paraphernalia, including a hypodermic needle and a substance resembling methamphetamine, in father's car; he tested positive for methamphetamines and marijuana; and he missed numerous drug tests, each of which could be properly viewed as "the equivalent of a positive test result" (*Christopher R.*, *supra*, 225 Cal.App.4th at p. 1217).

Instead, father makes two arguments, both of which we find unpersuasive.

First, father argues that because he lacked physical or legal custody of Kyle following the prior juvenile dependency matter, he had no legal duty to protect Kyle from a risk of physical harm. Father offers no authority in support of this contention. Whatever the extent of father's legal duty, he maintained his parental rights to Kyle and was entitled to monitored visitation. He had at least one unmonitored visit, with mother's knowledge, in June 2019. And, after the initiation of the current dependency proceedings, father continued to visit Kyle. Kyle's contact with father—even monitored—placed him in a position to be affected by father's substance abuse and could form the basis of dependency jurisdiction.

Second, father argues that a parent's substance abuse, by itself, is an insufficient basis for dependency jurisdiction, and that no factual nexus exists between his substance abuse and a threat to Kyle. Father fails to acknowledge that, because minor was five years old at the time of the adjudication hearing, he was a child of "'tender years'" and father's substance abuse

constituted prima facie evidence of his inability to provide regular care of him, resulting in a substantial risk of harm. (*Christopher R.*, *supra*, 225 Cal.App.4th at p. 1219; see also *K.B.*, *supra*, 59 Cal.App.5th at p. 603 ["When a child is of tender age, a parent's substance abuse can be prima facie evidence of a risk of serious physical harm or illness"].)  Despite father's lack of physical or legal custody of Kyle, there was sufficient evidence of a continuing relationship between father and Kyle—including unmonitored contact[7]—for the juvenile court to apply this presumption and make its jurisdictional finding.

### 3. *Count b-3:  Jeremy's substance abuse*

We agree with mother that substantial evidence does not support the finding of jurisdiction over Hailey based on her father Jeremy's substance abuse.[8]

---

[7]    That mother permitted father to have an unmonitored visit with Kyle is substantial evidence supporting the allegation in count b-2 that mother failed to protect Kyle from father's substance abuse.

[8]    DCFS argues that mother acquiesced to jurisdiction over Hailey by failing to object to or argue against the juvenile court sustaining count b-3, specifically.  We decline to find forfeiture. While "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962), "here, mother preserved her right to challenge the sufficiency of the evidence supporting the juvenile court's orders by requesting a contested jurisdictional/dispositional hearing . . . .  'Sufficiency of the evidence has always been viewed as a question necessarily and inherently raised in every contested trial of any issue of fact, and

Hailey was 11 years old at the time of the adjudication hearing; therefore, unlike Kyle, she was not considered a child of tender age for whom "a parent's substance abuse can be prima facie evidence of a risk of serious physical harm or illness." (*K.B.*, *supra*, 59 Cal.App.5th at p. 603; see also *Christopher R.*, *supra*, 225 Cal.App.4th at p. 1219 [children who are six years old or younger are "children of 'tender years'"].) In the absence of that presumption, "drug use or substance abuse, without more, is an insufficient ground to assert jurisdiction in dependency proceedings under section 300." (*In re L.W.* (2019) 32 Cal.App.5th 840, 849.) Here, we do not find substantial evidence of anything "more" (*ibid.*) beyond Jeremy's substance abuse to support jurisdiction over Hailey.

As of March 2019, mother had sole physical and legal custody of Hailey. Prior to Hailey's removal from mother in October 2019, the DCFS social worker noted that Hailey appeared clean and well cared for. Hailey attended school and denied any abuse. Jeremy had been entitled to monitored visitation, but contact between Jeremy and Hailey appears to have been minimal. Hailey did not live with Jeremy and his whereabouts were unknown. Unlike with Kyle and father, the record contains no evidence that mother had permitted Jeremy to have unmonitored visits with Hailey, in violation of a court order. Thus, unlike the b-2 count regarding father's substance abuse and the risk that posed to Kyle, the b-3 count regarding Jeremy's

requiring no further steps by the aggrieved party to be preserved for appeal.'" (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 136; see also *In re Javier G.* (2006) 137 Cal.App.4th 453, 464 ["Even if the parent does not contest the state of the evidence, he or she preserves the right to challenge it as insufficient to support a particular legal conclusion"].)

23

substance abuse did not include any allegation that mother had failed to protect the child.[9]

In short, there is insufficient evidence to support the juvenile court's finding that Jeremy's substance abuse is causing Hailey to suffer, or placing her at substantial risk of suffering, serious harm or illness, to support jurisdiction under section 300, subdivision (b)(1).

II. *Dispositional Order Removing Kyle from Mother*

Mother also challenges the evidentiary basis for the dispositional order removing Kyle from her custody.

A. <u>Applicable law and standard of review</u>

Before removing a minor from a parent's custody, the juvenile court "must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. (§ 361, subd. (c)(1).)" (*K.B.*, *supra*, 59 Cal.App.5th at p. 605.) "'"Clear and convincing" evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations.]' [Citation.] Actual harm to a child is not necessary before a child can be removed. 'Reasonable

---

[9]     The absence of allegations regarding mother's conduct in count b-3 does not deprive her of standing to challenge the juvenile court's finding on appeal. Hailey was declared a dependent of the juvenile court based on Jeremy's conduct as alleged in count b-3, thus affecting mother's parental rights. (See *In re A.K.* (2017) 12 Cal.App.5th 492, 499 ["Whether a person has standing to raise a particular issue on appeal depends upon whether the person's rights were injuriously affected by the judgment or order appealed from"].)

apprehension stands as an accepted basis for the exercise of state power.'" (*In re V.L.* (2020) 54 Cal.App.5th 147, 154 (*V.L.*).)

We review a dispositional order removing a minor from parental custody for substantial evidence. (*V.L.*, *supra*, 54 Cal.App.5th at p. 154.) The juvenile court must make its finding that a ground for removal exists under the clear and convincing evidence standard of proof. (§ 361, subd. (c).) Therefore, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

B. <u>Analysis</u>

The same evidence that supports the juvenile court's exercise of dependency jurisdiction over Kyle based on the allegations sustained in count b-1 regarding mother's inability to care for Kyle's medical condition also constitutes substantial evidence from which the court could find it highly probable that Kyle would be at risk of substantial danger if he returned to mother. (§ 361, subd. (c)(1).) Kyle has serious and complicated medical needs, which require significant monitoring by his caretaker. While mother received some training regarding how to care for Kyle, that training had not been implemented at the time of the adjudication hearing. A substantial risk of harm existed if Kyle returned home to mother's untested care. Contrary to mother's argument, such an inference is not speculative but common sense.

Mother discusses at some length various cases where removal orders were reversed on appeal. These cases are distinguishable.

25

First, none involved a seriously ill child whose parent lacked experience caring for his or her serious medical needs. (See *In re A.E.* (2014) 228 Cal.App.4th 820, 822 (*A.E.*) [reversing order removing a minor from his father based on "a single occasion of disciplining [the minor] by spanking her with a belt on her legs and buttocks"]; *In re Hailey T.* (2012) 212 Cal.App.4th 139, 147–149 (*Hailey T.*) [reversing order removing a minor from her parents based on physical abuse of a younger sibling]; *In re Steve W.* (1990) 217 Cal.App.3d 10, 12–13, 22–23 (*Steve W.*) [reversing order removing a minor from his mother's custody after his father killed the minor's half-sibling]; *In re W.O.* (1979) 88 Cal.App.3d 906, 907, 910–911 (*W.O.*) [reversing order removing two minors from their parents because cocaine and marijuana were discovered in the residence].)

Second, unlike here, the cases involved removal orders based "chiefly on speculation" (*Steve W.*, *supra*, 217 Cal.App.3d at p. 23); "a 'remote possibility'" of future harm (*W.O.*, *supra*, 88 Cal.App.3d at p. 910); "an isolated incident that is unlikely to recur" (*A.E.*, *supra*, 228 Cal.App.4th at p. 826); or abuse of a sibling (*Hailey T.*, *supra*, 212 Cal.App.4th at p. 148).

Mother also argues that less drastic alternatives to removal existed, such as unannounced DCFS visits to mother's home and overseeing the services of a public health nurse. While, under some circumstances, such methods of supervision might be sufficient to permit an in-home placement (see *In re Henry V.* (2004) 119 Cal.App.4th 522, 529), we do not find this to be such a case. "Unannounced visits can only assess the situation . . . at the time of the visit." (*In re A.F.* (2016) 3 Cal.App.5th 283, 293.) The same would be true of a public health nurse's visit. Kyle's medical condition requires constant monitoring and can rapidly

26

deteriorate.  Particularly given Kyle's young age and autism, which affects his ability to communicate, the risk that Kyle could face a medical emergency or a swift decline in between visits by DCFS or a public health nurse supports the juvenile court's finding that removal was necessary.

III.  *Dispositional Orders as to Father*

Regarding the dispositional orders affecting him, father argues, first, that the juvenile court erred by removing Kyle from both parents rather than just from mother.  Father asserts that he did not have custody of Kyle at the time of the adjudication hearing.  But this alone does not render the removal order erroneous, as section 361, subdivision (d), gives juvenile courts the explicit authority to remove a child from an offending *noncustodial* parent.[10]  Father offers us no other basis to find reversible error, thus forfeiting his challenge.  (See *In re J.F.* (2019) 39 Cal.App.5th 70, 79 ["The juvenile court's orders are 'presumed to be correct, and it is appellant's burden to affirmatively show error[]'"]; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [assertion in appellant's brief

---

[10]   Section 361, subdivision (d), provides:  "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody."

deemed waived if not accompanied by reasoned argument or citations to authority].)

Second, father argues that the juvenile court abused its discretion by ordering various reunification service programs for father even though he was not seeking to regain custody of Kyle. This argument has also been forfeited. When the juvenile court asked if any party wanted to be heard as to the disposition or the case plan, father's counsel stated: "It appears this is the same case plan my client was ordered last time other than the medical appointments and the CPR. I'd object to the CPR training. I don't see how that is narrowly tailored to address my client's issues in this case with the drug use."[11] Father did not object to other aspects of the case plan or waive reunification services, in writing, pursuant to section 361.5, subdivision (b)(14)(A)-(B). By failing to raise it below, father has not preserved the issue for our review. (See *In re Anthony Q.* (2016) 5 Cal.App.5th 336, 345 ["the forfeiture doctrine applies in dependency cases and the failure to object to a disposition order on a specific ground generally forfeits a parent's right to pursue that issue on appeal"].)

---

[11]     Father did not repeat this argument regarding CPR training in his appellate briefs.

28

# DISPOSITION

The juvenile court's jurisdictional findings and dispositional orders as to Kyle are affirmed.  The jurisdictional finding and corresponding dispositional orders as to Hailey are reversed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
ASHMANN-GERST

We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ